UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
ALFRED D. SANCHEZ and
LINDA J. SANCHEZ,
    Debtors.                                      No. 7-09-13618 SA

UNITED STATES TRUSTEE,
    Plaintiff,
v.                                                  Adv. No. 10-1032 S

ALFRED D. SANCHEZ and
LINDA J. SANCHEZ,
    Defendants.

## MEMORANDUM OPINION AFTER TRIAL ON
## US TRUSTEE'S COMPLAINT OBJECTING
## TO DEBTORS' DISCHARGE

This matter came before the Court for three days of trial on
the merits of the US Trustee's ("UST") Complaint Objecting to
Debtors' Discharge under Section 727. The UST appeared through
its trial attorney Alice Nystel Page. Defendants appeared
through their attorney Law Office of Brad L. Hays, LLC (Brad L.
Hays)[1]. This is a core proceeding. For the reasons set forth
below, the Court will deny the relief requested by the UST and
grant Debtors a discharge.[2]

## STANDARDS RELATING TO DENIAL OF DISCHARGE

_____

[1] Mr. Hays was not the attorney representing the Debtors in
their bankruptcy case.

[2] The Court has subject matter and personal jurisdiction
pursuant to 28 U.S.C. §§1334 and 157(b); this is a core
proceeding pursuant to 28 U.S.C. §157(b)(2)(J); and these
are findings of fact and conclusions of law as may be required by
Rule 7052 F.R.B.P.

The Complaint seeks denial of discharge under Sections 727(a)(2) and (a)(4). The statute provides as follows:

> (a) The court shall grant the debtor a discharge, unless--
> ...
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > (B) property of the estate, after the date of the filing of the petition;
> ...[or]
> (4) the debtor knowingly and fraudulently, in or in connection with the case--
> > (A) made a false oath or account;
> > (B) presented or used a false claim;
> > (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
> > (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

The Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor. Gullickson v. Brown (In re Brown), 108 F.3d 1290, 1292-93 (10th Cir. 1997).

To succeed in a denial of discharge under Section 727(a)(2)(A) the objector must show, by a preponderance of the evidence, that (1) the debtor transferred, removed, concealed, destroyed or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy or postpetition, (4) with the

Page -2-

intent to hinder, delay or defraud a creditor. Id. at 1293. The
objector must also prove actual intent to defraud. Marine
Midland Business Loans, Inc. v. Carey (In re Carey), 938 F.2d
1073, 1077 (10th Cir. 1991).

Debtors rarely admit an intent to hinder, delay or defraud a
creditor. United States Trustee v. Potter (In re Potter), 2009
WL 2913210 at *4 (Bankr. D. N.M. 2009)(citing Turner v. Keck (In
re Keck), 363 B.R. 193, 200 (Bankr. D. Kan. 2007)). Therefore,
Courts may consider actual direct evidence of fraud as well as
any circumstantial evidence of "badges of fraud." Wolkowitz v.
Beverly (In re Beverly), 374 B.R. 221, 236 (9th Cir. BAP 2007),
aff'd in part, dismissed in part, 551 F.3d 1092 (9th Cir. 2008)
(cited in Geyer & Associates CPA's, P.C. v. Stewart (In re
Stewart), 421 B.R. 603 at *3 (10th Cir. BAP 2009)(unpublished)).

> [B]adges of fraud evincing a debtor's actual intent to
> hinder, delay, or defraud include the following: (1)
> lack or inadequacy of consideration for transfer; (2)
> existence of a family, friendship, or special
> relationship between parties; (3) attempt by debtor to
> keep transfer secret; (4) financial condition of the
> party sought to be charged both before and after
> transaction; (5) existence or cumulative effect of
> pattern or series of transactions or course of conduct
> after incurrence of debt, onset of financial
> difficulties, or pendency or threat of suits by
> creditors; and (6) overall chronology of events and
> transactions. Gullickson, 108 F.3d at 1293.

First Savings Bank v. Turner (In re Turner), 335 B.R. 755, 761
(Bankr. D. N.M. 2005). "Some courts consider as a badge of fraud
the retention of possession, benefit, or use of the property in

Page -3-

question by the debtor even after the debtor transfers the property." Id. (citing In re Lang, 246 B.R. 463, 469 n. 9 (Bankr. D. Mass.), aff'd., 256 B.R. 539 (1st Cir. BAP 2000)).

To succeed in a denial of discharge under Section 727(a)(4) the objector must show, by a preponderance of the evidence, that the debtor (1) knowingly and fraudulently made a false oath, (2) relating to a "material" fact. Gullickson, 108 F.3d at 1294 (citing In re Hadley, 70 B.R. 51, 54 (Bankr. D. Kan. 1987)). Discharge will not be denied, however, if the false statement is due to mistake or inadvertence. Id. (citing In re Butler, 38 B.R. 884, 889 (Bankr. D. Kan. 1984)).

A false oath is "material" and thus sufficient to bar discharge "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Job v. Calder (In re Calder), 907 F.2d 953, 955 (10th Cir. 1990).

Finally, similar to the proof required for fraudulent concealment under section 727(a)(2)(A), intent can be deduced from the facts and circumstances of the individual case. Id. at 956 (citing In re Devers, 759 F.2d 751, 754 (9th Cir. 1985)).

**DISCUSSION**

Plaintiff's opening statement concisely sets forth the four theories on which it relies to deny discharge to these Debtors.

Case 10-01032-s    Doc 43    Filed 10/11/11    Entered 10/11/11 11:01:56 Page 4 of 32

Plaintiff relies on false statements and schedules filed in the case as well as transcripts of several section 341 meetings at which the Debtors testified under oath.

First, Plaintiff claims that Mr. Sanchez granted a mortgage on certain commercial property to his children ten months before the bankruptcy to protect that asset from creditors and then failed to disclose the transfer on the Statement of Financial ("SFA"). Plaintiff also alleges that Debtors then failed to disclose the sale of that property until the 341 meeting. Plaintiff claims that Debtors amended their SFA and stated that the transfer was for no cash. Then, allegedly Debtors' second amended SFA disclosed cash from the sale of $35,000 but in reality it was $45,000. Plaintiff claims that Debtors have not amended their statements again to correct the information or to account for the funds. Also, Plaintiff claims that the mortgage to the children was released for no consideration.

Second, Plaintiff claims that the sale of a Porsche automobile was not disclosed until the Debtors were questioned by the Chapter 7 Trustee at the 341 meeting. Plaintiff argues that the fact that the sale was one month pre-petition is evidence of fraud and that the Statements fail to disclose the disposition of the proceeds.

Third, Plaintiff claims that Debtors presented false testimony concerning the transfer of a Hummer automobile from the

Case 10-01032-s    Doc 43    Filed 10/11/11    Entered 10/11/11 11:01:56 Page 5 of 32

Debtors to Mr. Steve Garcia, Mr. Sanchez's employer.  Debtors claimed that the creditor repossessed the vehicle and that Mr. Garcia funded the redemption and took the title.

Finally, Plaintiff claims that the Debtors intentionally undervalued a Mercedes automobile on their Schedules to protect their exemption in the vehicle.

Overall, Plaintiff argues that these four events indicate a pattern of nondisclosure and intent to defraud creditors.  It also argues that the Debtors revealed undisclosed assets only under pressure.

**FACTS**

The UST's case is based mostly on the filings in this case and the testimony at section 341 meetings.  Therefore, the Court will start by discussing those items.

UST Exhibit 1 consists of Debtors' SFA and Schedules. Schedule A lists one parcel of real estate on Valtierra but says it was "sold for note."  Schedule B values the Mercedes at $12,000.  It lists no interests in corporations, parterships or other businesses.  Schedule D lists four creditors secured by real estate: Bank of America and GMAC were secured by Valtierra, and Chase Mortgage and First Horizon were secured by property on Talmadge.  Schedule F totals $1,735,771.  SFA question 10, concerning transfers of property, states "none."  SFA question 18, concerning businesses debtors have been involved in, lists

Page  -6-

ADS Mortgage, ADS Financial Services, Sterling Homes and Sterling Industries, and Sterling Properties. SFA question 21 (which applies only to corporate debtors, not individual debtors) discloses that Alfred Sanchez is President and 99% owner (of something) and Linda Sanchez is Vice President and 1% owner. Exhibit 1 was filed on September 8, 2009 as doc. 17, and was signed by both Debtors under penalty of perjury.

UST Exhibit 5 consists of the transcript of the first meeting of creditors conducted on September 14, 2009. At pages 2, l. 21 to p. 3, l. 6 the Trustee asked if the Debtors had read both the statements and schedules before they signed them, if they were true and correct, and if they listed everything that they owned and all of their debts, to which the Debtors answered yes. Three questions later, the Trustee asked if either of them owned land or buildings other than Valtierra. Mr. Sanchez said "Yes." Ex. 5, p. 3, l. 17. For the next three pages of the transcript, both Debtors are totally forthright in stating their current and/or previous ownership in the Coors residence, the Talmadge property, and a commercial property. When asked why they had not been listed on SFA question 10, Debtors' attorney stated:

> Other transfers? Because I think he was looking a[t] this "property transferred in the ordinary course of business. List all other property other than property transferred in the ordinary course of business." And so since he was doing real estate investment, those

Case 10-01032-s    Doc 43    Filed 10/11/11    Entered 10/11/11 11:01:56 Page 7 of 32

transfers were in the ordinary course of business, that
we can - - we can list them.

Ex. 5, p. 6, l. 21 to p.7, l. 2.  The questioning continued:

> Trustee: Well, the ordinary course of business in the
> real estate business would be to sell properties; I
> don't know that turning them over to creditors is in
> the ordinary course of business.
> Attorney: Well, I - - I understand what you're saying,
> He couldn't - - he couldn't pay them anymore.  His
> income collapsed, so - -
>
> Trustee: That's not ordinary course of business.
>
> Attorney: Okay, we can - - we can supplement that.
> That's no problem.

Id. p. 7, l. 3 to l. 12.  Then, starting at p. 7, l. 15 and
continuing to p. 13, l. 3 the Trustee and Mr. Sanchez discuss in
detail, albeit confused detail, the commercial property.  Mr.
Sanchez disclosed that it was one acre, its location, its value
of $500,000, a debt on it of $350,000, the fact that he was about
to go into default on February 29, 2009, that he co-owned it with
two other people, that one of them agreed to take over the
payments, he owed that person $200,000, he signed a deed to that
person on February 15th and received $200,000 debt cancellation.
He testified that their relationship was not like a partnership,
but like a "joint venture, if you will."  He further disclosed
his original intent to build a commercial building on the
property with funding from Wells Fargo, but that at the last
minute the funding fell through, causing his bankruptcy.

Case 10-01032-s    Doc 43    Filed 10/11/11    Entered 10/11/11 11:01:56 Page 8 of 32

The Trustee then asked about the status of Valtierra, stating that Schedule A said it was sold to third party for the amount of the note. Ex. 5, p. 13, l. 11. Mr. Sanchez stated that was not true; he had told the current tenants that they were welcome to buy it for the note. Debtors' attorney then stated: "I didn't understand what he is saying. It's in foreclosure." Id. l. 25 to p. 14, l. 1.

The Trustee asked if anyone owed them any money. Id. p. 14, l. 21. Mr. Sanchez stated that he had two construction contracts, one worth $600,000 and the other worth $700,000, which both defaulted. Id. l. 22 to l. 25. He stated "we've been in litigation now for, God, almost a year now." Id. p. 15, ll. 2-3. The Trustee asked if these contracts were owed to the Debtors, individually, or whether they were owed to one of his businesses. Mr. Sanchez answered: "No, they owe it to me as a corporation, right." Id. l. 11-12. After some comparatively lengthy questioning by creditors and creditors' attorneys, the Trustee asked Debtors' attorney to provide documents and to amend the Statements and SFA to reflect items that had been discussed. He scheduled a continued creditors' meeting for October 26, 2009.

UST Exhibit 2 consists of Debtors' Amended SFA and Schedules. SFA question 10 now discloses transfers:

| Transferee | Date | Property |
|------------|------|----------|

Page -9-

| 1. | Chase Mortgage (deeded to Cordova) | 12/08 | Talmadge. "Ordinary course of business" |
|---|---|---|---|
| 2. | EMC Mortgage (since foreclosed) | 8/09 | residence 6301 Coors "Ordinary course of business" |
| 3. | First Horizon | being foreclosed | Talmadge "Ordinary course of business" |
| 4. | GMAC Mortgage | in foreclosure | residence Coors "Ordinary course of business" |
| 5. | Southwest Lending (deeded to Lloyd) | 2/09 | commercial lot "Ordinary course of business" |
| 6. | Bank of America Mortgage | in foreclosure | Valtierra residence "Ordinary course of business" |

Exhibit 2 was filed on October 1, 2009 as doc. 25, and was signed by both Debtors under penalty of perjury.

Exhibit 6 consists of the transcript of the continued meeting of creditors conducted on October 26, 2009. The Trustee confirmed that amendments had been filed, reminded the Debtors they were still under oath, and confirmed that he had been provided with all the documents he had requested. Then he turned the questioning over to a creditor's attorney who did a very complete review of the statements and schedules with the Debtors. The attorney asked the Debtors why their state court lawsuit was not listed in their schedules. Debtors' attorney answered "No,

it was listed in the Schedules as being abandoned, I believe.
He's abandoning all litigation." Ex. 6, p. 8, l. 25 to p. 9, l.
2.  As the questioning continued, Debtors' attorney searched
through the Statements and SFA for the listing of the lawsuit.
Then, creditor's attorney asked if he ever found the listing.
Id. p. 15, l. 24.  Debtors' attorney answered "I was not able to
find that.  The only lawsuit that I was aware of in speaking to
him that he had an interest in - - ".  Id. l. 25 to p. 16, l. 2.
Mr. Sanchez corrected the attorney and said "There were two.
There were - - ".  His attorney told him to "go ahead and
explain." Id. l. 5.  Mr. Sanchez gave details of the lawsuits,
and then Debtors' attorney added:

> [F]or some strange reason, I don't know why, it's - -
> it should be under 4.  It was not listed, so I'm going
> to amend it to reflect the two. ... Yeah, those were
> the two that he had an interest in that he was
> abandoning.  I don't know how it got left out, I don't
> know why.  I was looking, and it's question number 4,
> obviously, this has to do with that information, but we
> can just amend that.  I don't - - I don't know how it
> got left out.

Id. p. 17, l. 18 to p. 18, l. 4.

    As the questioning continued, creditor's attorney asked "Can
you tell me why, if you and your wife own these three
corporations or - - that none of them are listed in your
schedules?" Id. p. 20, l. 24.  Debtors' attorney answered that

they were disclosed in the amended SFA under question 10.[3]  Id.
p. 21, ll. 9-10.  The Trustee told the attorney that if the
Debtors owned a corporation, it had to be listed on Schedule B,
and that any lawsuits had to be listed on Schedule B as well.
Id. ll. 10-12 and ll. 24-25.  The Trustee then continued the
meeting of creditors again, and instructed Debtors' attorney to
go over the Schedules line by line to ensure that everything was
complete and to file amendments as necessary.  Id. p. 23, ll. 20-
24.  The meeting was continued to November 9, 2009.  Id. p. 28,
ll. 24-25.

UST Exhibit 3 consists of Debtors' second amended SFA and
Schedules.  Schedule A was amended to now list real properties in
addition to Valtierra.  It adds their former residence on Coors
with a value of $-0- and a secured debt of $1.65 million, five
different investment properties (none with any equity), and a
property they now reside in as tenants (Buckeye).  Schedule B now
valued the same Mercedes at $19,000.  Schedule B item 13 was also
amended to add stocks: ADS Mortgage, value $1000; Sterling Homes
and Industries, $1000; Sterling Properties, $-0-; and ADS
Financial, $-0-.  Schedule B item 21 discloses two lawsuits
having a total value of $1.3 million.  Schedule F was amended to
total $1,893,546.  Exhibit 3 was filed on December 3, 2009 as

_____

[3] This makes no sense.  Question 10 deals with property
transfers, not ownership of businesses.

doc. 55, and was signed by both Debtors under penalty of perjury. The date of the signatures appears as December 3, 2009. Both Debtors testified that they refused to sign the amendments on that date because they had not had an opportunity to review them for correctness. They did not know who inserted the date. The date appears to be different handwriting from the Debtors'. Debtors further testified that they signed a signature page on December 29, 2009 because they were told by their attorney that he could not file third amended statements and schedules until the second ones had been signed.

Debtors' Exhibit V contains the transcript of the November 9, 2009 meeting of creditors. The Trustee states, in relevant part:

> The debtors do appear. However, there has been no amendments that were required, and other data, not to mention the debtors' attorney is not present, so we're going to adjourn this meeting to the 3rd of December at 10:30 a.m.

Debtors' Exhibit AA contains the transcript of the December 3, 2009 meeting of creditors. The Trustee states, in relevant part:

> [W]e were adjourned for today so that I could review amended statements and schedules that were to have been filed prior to today. That wasn't done. I was handed an unfiled copy of what apparently was filed earlier today, statements and schedules, which I haven't had a chance to review. And I don't know that there is any point in going over those at this time.

The Trustee rescheduled the creditors meeting, yet again, to January 15, 2010.

UST Exhibit 4 consists of Debtors' third amended SFA and Schedules. Schedule B now lists the same Mercedes with a value of $15,000. Schedule F now totals $2,843,132. Both the SFA and Schedules were signed by Debtors on December 29, 2009 under penalty of perjury. Exhibit 4 was filed on December 29, 2009 as doc. 60.

UST Exhibit 7 consists of the transcript of the continued meeting of creditors conducted on January 15, 2010. The first fifty-three pages consist of questioning by the Trustee and Ms. Michelle Lombard, a Bankruptcy Analyst from the UST's office, on the topics of real estate, transfers, and business dealings. Debtors fully answered all question asked. During this questioning, Debtors first disclosed that when the commercial property was transferred, Mr. Sanchez also received $35,000 (later discovered to be $45,000). Ex. 7, pp. 15-16. And, this was the first time that Debtors revealed the mortgage to the children. Id., pp. 23-28.

On page 58 the Trustee asked Ms. Sanchez if she ever owned a Porsche. She stated that yes, she had, but had sold it to someone in Canada. Id. p. 59, ll. 2-9. On page 73, the UST representative asked why the Mercedes had been valued at $12,000, then $19,000 then $15,000 when the Blue Book value was $25,000.

Page -14-

<u>Id.</u> p. 74, ll. 6-8.  Mr. Sanchez responded that it needed $10,00

of work.  She also asked what had happened to the Debtors'

Hummer.  <u>Id.</u> p. 75, l. 20.  Mr. Sanchez stated that it had been

repossessed.  Debtors later stated that the Porsche had sold

through a Craiglist internet listing for $10,000.  <u>Id.</u> p. 77, ll.

17 to p. 78 l. 4.  On pages 79 through 83 the Debtors disclosed

how the Hummer had been repossessed, how it came to be owned by

Mr. Sanchez's employer, and its ultimate disposition to third

parties.

**<u>THE TRIAL</u>**

The UST's first witness was Stella Cordova, who worked as

Mr. Sanchez's personal secretary and general manager for his

companies from November 2005 to November 2008.  She testified

that starting in 2008 the bills were not getting paid timely

because the money was not coming in as it had previously.

She was familiar with both the Porsche and the Mercedes

owned by the Debtors.  Both vehicles were in Debtors' possession

when she left her job in November 2008.

Ms. Cordova was also familiar with the mortgage from Mr.

Sanchez to the children.  UST Ex. 19.  She testified that she and

Mr. Sanchez drafted the mortgage.  The opening line of the

mortgage states that it is "made" on April 17, 2006.  Mr. Sanchez

signed it; there is no date accompanying his signature line.  The

acknowledgment by Ms. Cordova is also dated April 17, 2006.

However, the promissory note attached to the mortgage and labeled Exhibit A to the mortgage, states that Mr. Sanchez promises to pay $359,000 on April 17, 2006 [sic]. The next sentence says the note shall become due and payable on April 17, 2016. The note is signed by Mr. Sanchez with a date of April 17, 2008. The mortgage was filed of record November 5, 2008.

The UST's second witness was "Sunny" Chavez, an experienced insurance adjuster and auto appraiser. The Court accepted him as an expert on vehicle appraisals. His appraisal report on the Mercedes appears as UST Ex. 14. His value was $24,292 without factoring in any mechanical repairs and without analyzing what repairs would be necessary. UST Ex. G is an estimate of repairs that the Mercedes dealer provided to Mr. Chavez that totals about $11,000 plus tax. However, there were some duplicate repairs that Mr. Chavez had already considered in arriving at his value of $24,292. Subtracting these duplicate expenses reduces the Ex. G amount to about $9,650. Therefore, the Court finds that a fair estimate of the Mercedes' value would be $24,292 less $9,650, or $14,642.

Mr. Chavez also had a different estimate of mechanical repairs of $6,800. If this were more accurate, the fair value would be $2,850 higher, or $17,492.

On cross-examination, Mr. Chavez was asked if a lay person, without the resources available to him as a professional car

appraiser, could have come up with a reliable value for this vehicle. He testified: "I don't think so."[4]

The Debtors initially valued the Mercedes at $12,000 (UST Ex. 1, doc 17). The Court finds that Debtors did not review the Second Amended SFA and Schedules (UST Ex. 3, doc 55) before their attorney filed them[5]. Therefore, the Court finds that Debtors did not adopt the value of $19,000 listed on those Schedules. The Third Amended SFA and Schedules (UST Ex. 3, doc 55) valued the Mercedes at $15,000. The Court finds both the $12,000 and $15,000 reasonable, given the experts' values and the difficulty in appraising a high end vehicle with unknown needed repairs.

The UST's third witness was Phillip Montoya, the Chapter 7 Trustee for the case. His testimony closely tracked the transcripts of the creditors meetings and the series of amended documents, but usefully added his observations and impressions.

He first testified about the lack of disclosure of the commercial property transfer. However, Mr. Sanchez readily acknowledged his prior ownership at the first meeting of

---

[4] During the defense case, Debtors also called Ricardo Brack, the president of German Motor Works, Inc., an Albuquerque dealer of German and Swedish cars. The Court accepted him as an expert in both Mercedes repairs and valuations. He currently had possession of the subject Mercedes at the request of the case trustee, and is performing mechanical repairs. He believed that the total repairs would be about $7,500 and that he would market it, after the repairs were done, for $20,000.

[5] See discussion starting on page 21, below. ("From the October meeting ... ")

creditors. The Trustee continued the meeting of creditors because he was not satisfied with the completeness of the disclosures. "A lot of things were not scheduled and the Debtors could not explain." He also testified that he asked Debtors' attorney to amend the papers and provide supporting documents from both the Debtors' personal affairs as well as business affairs. He testified that the documents requested were provided.

Mr. Montoya further testified that during the second creditors meeting Mr. Sanchez explained his business relationship with Mr. Lloyd, who had a second mortgage on the property, and that the property was held by "like a partnership with Mr. Lloyd and Mr. Brown", and that he transferred the property to them in full satisfaction of debts he owed them and their agreement to continue paying the first mortgage. Mr. Montoya recalled that Mr. Sanchez valued the property at between $500,000 and $550,000 and that it had a first mortgage of about $350,000 and a second mortgage of about $100,000. Instead of concluding the creditors meeting, the Trustee continued it again to ensure that the schedules were correct.

Mr. Montoya testified that after the creditors meetings he investigated the commercial property to see if he should attempt to recover it. He discovered that the values were as stated and

Case 10-01032-s   Doc 43   Filed 10/11/11   Entered 10/11/11 11:01:56 Page 18 of 32

that the mortgages were valid liens on the property.  He decided against trying to recover it.

Mr. Montoya also testified regarding the Debtors' Hummer, which had been repossessed.  He basically agreed with the Debtors' version of repossession, redemption using funds provided by Mr. Garcia (Mr. Sanchez's employer), and subsequent transfer to Mr. Garcia.  He decided to not pursue recovery.

On cross-examination, Mr. Montoya testified that it appeared to him that Debtors' bankruptcy attorney advised them not to list the omitted transfers.  This is supported by the quoted passage above from the first creditors meeting where the attorney stated that he had not listed transfers that were made in the ordinary course of business.  He apparently believed that since Mr. Sanchez was a realtor, any transfer of real estate should not be included.  Mr. Montoya testified: "To be perfectly honest, nothing [this attorney] would do on statements and schedules would surprise me.  What he advised, I can't say."  Mr. Montoya explicitly testified that he did not believe that Mr. Sanchez was misleading, but he did believe that certain items should have come up earlier, such as the cash received in exchange for the commercial property.

Mr. Montoya either read, or attended, the deposition of Mr. Lloyd in this case.  He testified that substantially all of Mr. Sanchez's testimony was corroborated by Mr. Lloyd's (with the

exception that Mr. Lloyd stated that, in addition to what Mr. Sanchez described, he also paid back due property taxes and interest on those taxes on the property.) The Trustee was clear that Mr. Sanchez did not transfer the property for less than its value.

The UST's final witness was Lawrence Lloyd. His testimony confirmed the details of his relationship with Mr. Sanchez regarding the commercial property. He also confirmed that it was transferred to him because Debtors could no longer pay the mortgage and he was willing to make the payments and forgive debt in exchange for it. He also testified that Mr. Sanchez never suggested structuring the transaction to disguise any payments or misdirect them, nor did he attempt to conceal the transfer or the payment. He also confirmed that Mr. Sanchez has no current or future interest in the property. The UST concluded its case by asking the Court to take judicial notice of anything in the file, to which the Debtors did not object.

Debtor Linda Sanchez testified first for the Debtors. She is a well-spoken, highly intelligent and completely believable witness. She has a Master's Degree in Education, and currently works as an "instructional coach" (in her words, she teaches the teachers) at a Middle School in Albuquerque. Previously she was a classroom teacher. There is no doubt that she had and has no involvement with Mr. Sanchez's business affairs. She described

Case 10-01032-s    Doc 43    Filed 10/11/11    Entered 10/11/11 11:01:56 Page 20 of 32

herself as a full-time teacher, working early and late, with no present or past interest in being in business with her husband.

She testified that they decided to file bankruptcy in August, 2009 when she was notified that her paycheck would be garnished by one of her husband's business vendors. At first, it appeared that she took the situation well. "It was one of those business things." Her husband picked out the bankruptcy attorney, but she had no idea how he did that. Then, the situation apparently turned for the worse. The attorney gave them lots of forms to fill out and papers to read. Lacking a business background, she found it difficult to understand a lot of the questions and even more difficult to answer. She testified that she did the best she could. She succinctly described the first meeting of creditors: "It was horrible." Her memory of the meeting was that mostly the Trustee was angry and spent his time telling their attorney what and where to put information on the forms.

Her next public encounter with the process was the October, 2009 creditors meeting. All she recalled was that the forms were still not right and the Trustee was asking a lot about her husband's businesses. The meeting was continued to November 9, 2009.

From the October meeting to the November 9, 2009 meeting, she never spoke to the attorney. When the attorney failed to

appear at the November meeting, the Trustee continued it to December 3.  During that month, she and her husband worked diligently to provide everything that their attorney and the Trustee wanted.  On December 3, before the next meeting, their attorney presented them with amended statements and schedules, represented that he had made all the necessary corrections, and instructed the Debtors to sign and date the signature page.  They refused because they had had no opportunity to examine them.  The attorney filed the papers without a signature and presented unsigned copies to the Trustee at the meeting.  The Trustee refused to consider the untimely and unsigned copies, and continued the creditors meeting to January.

In late December, their bankruptcy attorney requested that they now sign the Third Amended Schedules and SFA.  He told them that he had prepared a Fourth, and hopefully final set, and that the Fourth set could not be filed until the Third had been signed.  They signed.

At the January 15, 2010 meeting of creditors, the Trustee asked Ms. Sanchez if she ever owned a Porsche.  She stated she had.  Debtor Ex. B is the title.  She testified that earlier in the year, she could not remember exactly, she posted an advertisement on the internet site Craigslist, and a man from Canada purchased it.  Mr. Sanchez believed she received $10,000; she later testified that she believed it was either $10,000 or

$12,000.  She testified that she sold it for its fair market value.  She also testified that she simply forgot to list it on the forms.  She stated that she deposited the money into the checking account and used it to "try to" pay bills, which were all overdue.  She testified that she was under a lot of stress at the time, many creditors were calling incessantly, both at home and at her work, and felt that she could not escape.  When asked why she had omitted it, she stated: "Everyone assumes we know what we're doing.  But to me property is land and houses, not vehicles and furniture.  I did not know."  When asked why she had not amended to include it, she stated that her attorney never told her it was required and never advised her to do so.  She testified that she and her husband had gone line by line through each iteration of the documents.  She repeatedly emphasized that at all times she and her husband believed the filings were correct.

Mr. Sanchez also testified.  He never contemplated bankruptcy until a state court issued a bench warrant for his failure to appear in court to show his financial statements in aid of execution of judgment.  He also, at about the same time, learned of the pending garnishment of Ms. Sanchez.  He knew a bankruptcy attorney through his association with the University of New Mexico Lobo Club.

He met the bankruptcy attorney who told him that this would be a "personal" bankruptcy.  He also told him that after he received his personal discharge, then they could proceed to file separate business bankruptcies for each corporation.  Mr. Sanchez believed[6] this, and therefore also believed that the business transactions, no matter how structured, were irrelevant to his personal case.  The Court finds, under all of the circumstances, that his belief was reasonable.

At the time of trial, Mr. Sanchez had been employed for eighteen months as a limo driver for Lucky Boy Limos, owned by Mr. Garcia.  Mr. Garcia is a friend of Mr. Sanchez.  Mr. Sanchez testified that they formerly owned a Hummer (financed through Lighthouse Financial at 115% interest per year) that was repossessed while they were out shopping in late May or early June, 2009.  At the time of repossession, Debtors owed only about $8,000 to $9,000.  However, they did not have the money to redeem the car.  Mr. Sanchez called Mr. Garcia, for whom he had already started working, and asked for a ride home.  Mr. Garcia did give

---

[6]The UST argued that Mr. Sanchez should be deemed to be a sophisticated business person due to his ownership of four businesses and dealings with large banks on large real estate deals.  While the Court finds him relatively knowledgeable about real estate, the Court also finds him surprisingly unsophisticated about business in general.  For example, when asked who owned the contracts that were subject to the state court breach of contract litigation, Mr. Sanchez answered "No, they owe it to me as a corporation."  UST Ex. 5, p. 15, l. 11-12. The Court also specifically finds that he has little to no knowledge of bankruptcy law.

them a ride home, and during the conversation suggested that he redeem the vehicle and use it in his business. Mr. Sanchez agreed, but Lighthouse insisted that the redemption be in Mr. Sanchez's name as owner of the car, so Mr. Garcia loaned the money to Mr. Sanchez to redeem the car and Mr. Garcia signed the title over to him. In fact, Mr. Garcia used the vehicle in his business and allowed Mr. Sanchez to drive it home from time to time. Mr. Garcia also allowed other employees to drive vehicles home. Mr. Garcia later sold the Hummer and Mr. Sanchez did not receive any proceeds.

Mr. Sanchez testified that when he stated he received $35,000 out of the transfer of the commercial building, he was mistaken. He further testified that he had not realized he misspoke until he attended Mr. Lloyd's deposition who correctly stated the amount as $45,000. He testified that he intended to answer honestly, and had no motive to lie about the amount. He testified that he received the money, deposited it, and then used all of it for ordinary bills and living expenses. He stated that there was no part of the $45,000 remaining when he filed bankruptcy. Mr. Sanchez further testified that he explained this transaction to his bankruptcy attorney, who reminded him that this was only a personal bankruptcy that had nothing to do with the corporations. When further questioned about this transaction, Mr. Sanchez admitted the land had been personally

Case 10-01032-s   Doc 43   Filed 10/11/11   Entered 10/11/11 11:01:56 Page 25 of 32

owned, and that he had explained it to the bankruptcy attorney, but then the bankruptcy attorney also said it was an ordinary course of business transaction that should be omitted.

Mr. Sanchez described the circumstances under which he executed a mortgage to his children. Their grandfather had died and left them a considerable amount of money. Without providing details, it seems the money was entrusted to Mr. Sanchez, and that it went into operating expenses for Mr. Sanchez's businesses. He thought he should provide for repayment of these funds, and executed the mortgage. He specifically testified that he signed it on April 17, 2008, but that he did not record it. Neither child received any money as a result of the mortgage, and they voluntarily released it when Mr. Sanchez transferred the property to Lloyd.

The remainder of Mr. Sanchez's testimony was largely repetitive of Ms. Sanchez's testimony. The Court will therefore not repeat the details.

**CONCLUSIONS OF LAW**

1.  Plaintiff's first theory is that because Mr. Sanchez did not disclose the mortgage to his children or the transfer of the commercial property on his original filings, his discharge should be denied. The Court will address each part.

First, the evidence before the Court established that Mr. Sanchez owed a debt to the children. And, the evidence suggests

a preference to the children.  See 11 U.S.C. § 547.  The making
of a preferential transfer, however, is not evidence of intent to
hinder, delay or defraud other creditors.  See Conrol Power
Systems, Inc. v. Reddington (In re Reddington), 36 B.R. 62, 65
(Bankr. S.D. Fla. 1984)(citing In re White v. Brown Shoe Co., 30
F.2d 674 (5th Cir. 1929))("[I]t is clear that a mere preferential
transfer is not the equivalent of a fraudulent transfer for
purposes of an objection to discharge and would further not
constitute evidence of actual fraud."); Everwed Co. v. Ayers (In
re Ayers), 25 B.R. 762, 770 (Bankr. M.D. Tenn. 1982)("Like the
Act, the Code does not make a preference an objection to
discharge.  There is no element of moral turpitude connected with
the giving of a mere preference."); Coder v. Arts (In re
Armstrong), 213 U.S. 223, 241 (1909)("An attempt to prefer is not
to be confounded with an attempt to defraud, nor a preferential
transfer with a fraudulent one.")(citation omitted); Marchbanks
v. McCullough, 47 N.M. 13, 132 P.2d 426, 429 (1943)("[T]here is
no law which prevents a preference of one creditor over another
(except bankruptcy and insolvency laws not involved here), if the
transfer is not in fact made with the intent and purpose of
hindering, delaying or defrauding any creditor; notwithstanding
the transferer may be insolvent, although the effect will be to
hinder and delay other creditors.")  Nothing else in the
complaint or in the proof at trial suggests an actual intent by

Case 10-01032-s    Doc 43    Filed 10/11/11    Entered 10/11/11 11:01:56    Page 27 of 32

Mr. Sanchez to hinder, delay or defraud creditors. All the UST proved is that the Debtor executed a mortgage to his children. But, a relationship between the parties does not, by itself, cast suspicion upon the transaction or create a prima facie presumption of invalidity. Gottlieb v. Thatcher, 151 U.S. 271, 279 (1894). Accord Lumpkins v. KcPhee, 59 N.M. 442, 450, 286 P.2d 299, 303 (1955)("The fact that the parties to the transaction are related by blood or marriage is to be considered, of course, but it requires more than that to impeach an otherwise valid conveyance."). See also § 56-10-18(B)(1) NMSA ("In determining actual intent ... consideration may be given, among other factors, to whether: (1) the transfer or obligation was to an insider."

Because the UST did not prove actual fraudulent intent, the Court looks at "badges of fraud" to determine intent. Gullickson, 108 F.3d at 1293. Therefore, the Court will review the facts to identify badges of fraud set out in Turner, 335 B.R. at 761.

|    | Badge of fraud | Evidence |
|----|----------------|----------|
| 1. | Lack or inadequacy of consideration | Only testimony was from Mr. Sanchez, that he owed the children. Under § 56-10-17 NMSA, value is given if, in exchange, an antecedent debt is secured or satisfied. |
| 2. | family, friendship or special relationship | Family relationship. |

Page -28-

| | | |
|---|---|---|
| 3. | attempt to keep transfer secret | No direct evidence Mr. Sanchez attempted to keep the transfer secret.  His failure to list it on the SFA is not dispositive, based on claims that his attorney instructed him that it was an ordinary course of business transaction that should not be disclosed.  The fact that he retained ownership of the land is not relevant, because the transfer – the mortgage – was a lien on the asset, not a transfer of the asset itself, which would have been by deed.  See Gullickson, 108 F.3d at 1293. |
| 4. | financial condition before and after transfer | No direct evidence presented that the transfer caused them to become insolvent. |
| 5. | existence of cumulative effect or pattern | There was a single transaction with the children.  There is no evidence of other mortgages on the commercial property. |
| 6. | overall chronology | Nothing probative.  Debtors were in bad shape before, during, and after the transfer. |
| 7. | other factors | The children voluntarily released the mortgage, without consideration, before the bankruptcy was filed.  The property itself was transferred before the bankruptcy itself. Debtors' attorney omitted disclosure of the transfer; Debtors readily disclosed property transfer at the first meeting of creditors.  Debtors had no motive to hide the transfer. |

Second, it is true that Debtors omitted the transfer of the commercial property from their SFA.  Debtors both testified they

had made their attorney aware of the transfer. Debtors' attorney announced at the first meeting that he had omitted "ordinary course of business transfers." When the Trustee requested an amendment to SFA question 10, the attorney complied, but insisted on describing each transfer as an "ordinary course of business" transaction. The Court has found that the Debtors reasonably relied on their attorney. This reliance negates any fraudulent intent. Furthermore, one purpose of the disclosure requirement is to ensure that the trustee and all creditors are aware of all of the debtors' business transactions and assets so that they (trustee and creditors) can evaluate for themselves the value of the assets at issue. See, e.g., Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992). In this case, that purpose is not defeated: there was no equity, it was transferred before the commencement of the case, and its disclosure could not have lead to additional estate assets.

2. Plaintiff's second theory is that because Debtors did not disclose the sale of the Porsche, their discharge should be denied. The Court finds that the omission was mere mistake or inadvertence. The omission was not knowing and fraudulent. When questioned about the vehicle at the creditors meeting, Debtors readily disclosed the transfer. The Debtors also testified that the funds were reasonably used and not squandered or hidden.

3.   Plaintiff's third theory is that because Debtors presented false testimony regarding the Hummer, their discharge should be denied.   The Court finds that the testimony was true.   The Court also finds that the evidence presented does not show a continuing concealment of the Hummer.

4.   Plaintiff's fourth theory is that the Debtors undervalued their Mercedes to protect their exemption.   The Court finds that Debtors did not undervalue the Mercedes or, if they did, it was not intentional or willful.

**CONCLUSION**

The Court concludes that the UST has failed to meet its burden of proof to show that the Debtors either acted with an intent to hinder, delay or defraud creditors, or made a false oath in connection with the case.   The Court will dismiss this adversary proceeding and grant Debtors their discharge.[7]

---

[7] This ruling should not be taken in any way to constitute a criticism of the United States Trustee for prosecuting this §727 action.   Certainly the facts on their face suggest the likelihood of wrongdoing, and that office could not be expected to anticipate such surprising conduct on the part of Debtors' bankruptcy counsel that turned out to be at the heart of the suspicious behavior that led to this prosecution.



Honorable James S. Starzynski
United States Bankruptcy Judge

Date entered on docket: October 11, 2011

Copies to:

Alice Nystel Page
Office of UST
PO Box 608
Albuquerque, NM 87103

Brad L Hays
PO Box 15520
Rio Rancho, NM 87174-0520

Page -32-